Hemphill, Ch. J.
The examination of the first ground assigned will necessarily involve the consideration of several questions, which must be determined before a conclusion as to the propriety or the error of the ruling of the court can be attained. The various points presented by the proposition raised by the exception, as to the legal sufficiency of the petition, have been discussed with an ability, a zeal, and elaborate research worthy of the counsel engaged, and due to the importance of the interests and principles involved in'the cause. They have not been treated in the arguments of the opposing parties in the same order; and I shall not attempt to examine all the legal positions assumed in their respective arguments, or to follow the order in which they have been arranged by either of the parties.
The question of primary importance, which lies at the foundation of the exception, is as to the force an deflect of the judgment rendered in the. District Court at the Spring Term, 18-13. In considering this point, it will be recollected that the parties, plaintiffs and defendants, and the subject-matter of controversy, are in both suits the same. The object of both is to recover, on tiie part of the plaintiffs as sole heirs of the deceased Kosseau, the same league of land from the same defendants, and to cause the orders and decrees of the Probate Court affecting the right of the plaintiffs to this specific tract of land to be vacated and annulled.
With these preliminary remarks, I proceed to consider the force and effect of the decree of 1843.
It is denied by the appellees to be a decree at all, or a judgment of the court, or any other than a mere agreement between two of the parties; that it was not enrolled as a decree of the court, aud does not even appear to have been entered on its minutes.
If we examine the terms of this document, to ascertain its character, we shall find striking and abundant evidence that it can well claim the denomination of a judgment solemnly entered by the court. It is expressly declared to be the decree of the court, and made with its assent; and if we refer to extraneous evidence, we find the decree, as copied in the transcript, to have all the indicia and marks of being regularly entered upon the minutes of the court.
The decree does' not, on the transcript, appear to have been signed by the judge, nor does l he clerk specifically certify that it is the decree of the court; but the want of this does not impeach its character as a judgment. The judge does not sign eacii judgment separately, and the transcript in no case furnishes evidence of such signature. Nor does the clerk certify to each entry, specifying its precise character; and his certificate that the transcript was a true copy of the original documents now on file in his office, as well as all the proceedings liad thereon appertaining to the. cause in the said court, is in the usual form, and does not sustain the proposition that the document appearing as the decree was not the judgment of the court rendered inftlie premises. The fact that it was signed by two of the parties only does not affect its character as a judgment. It was in proof that it was drawn up by the attorney of all the *97 'plaintiffs; or, at least, that it was modified by him, and tinder his direction ■assumed the iovm in which it ultimately appeared in the cause. Had it not been entered on the minutes, the fact could have been established in the •court below by recurrence to its own records, and this would doubtless have not been pretermitted had any such fact existed. The judgment of the court in this case also treats the entry under consideration as a decree formerly rendered in the District Court, and eo nomine declares it to be vacated and 'annulled.
There was no evidence introduced to show that this was not the judgment ■of the court, and it is extremely problematical whether any was admissible to -contradict the record, unless on the ground of fraud and collusion of the pasties or their attorneys, &c.
In this case the record expressly declares that the decree was made with the ■assent of the parties, complainants and defendants. The entry itself, in its -terms, implies the judgment of the court, that the parties either appeared personally or by attorneys having competent authority for that purpose, and consented to the decree about to be rendered, and which was then made; and judicial records would have but little efficacy, and their permanency as memorials of adjudications upon the rights of parties would be defeated, if they could generally be impeached by extrinsic testimony tending to show their falsity in ■some fact material to their validity. The consideration of the rule in relation to the unimpeachable verity of a record and its exceptions would involve an extended discussion upon which, for the decision of this cause, it is not necessary to enter. Por illustrations of the rule, vide 5 Dana, Ilolbert v. Montgomery, p. 11, in which it was held that where the record stated that by the u consent of the parties” a judgment of the former term was set aside, and a new ■trial granted, “as per agreement of parties, by their attorneys, filed,” the defendant may plead and rely upon the order as a bar in scire facias to revive ■the original judgment; and the plaintiff will be estopped by the record from replying that tlie order was made without his consent, authority, or sanction.
Having determined that this entry constitutes a judgment, and is not a mere .unofficial agreement, the next inquiry is as to its rank or quality, whether it be interlocutory and entirely within the subsequent control of the court, or whether it be final in its nature, and conclusive on the rights of the parties,‘if •not reversed in the ordinary processes of revision prescribed by the law.
The character of the judgment must be tested by its operation on the objects -sought to be attained by the proceeding. If the cause be determined on Us merits, if the rights controverted between the parties be settled, the decree will be final, although ulterior proceedings to carry the judgment into effect may be required. The petition in the cause alleges that the complainants were the ■sole heirs of the deceased, and by averment they impeach a decree of the Probate Court in relation to a league of land, a portion of the estate of the deceased, .and pray that the said decree be annulled and the tract of land be surrendered to them, and that they be paid the rents and profits accruing.
The matters in controversy were as to the illegality and fraud of the judgment of the County Court, and the rights of the parties respectively to the land ■in question.
The decree, in terms, disposes of the rights of the parties in the land, and, .in effect, and by necessary intendment, annuls the decree of the Probate Court to the extent of its operation on this specific portion of the succession.
The invalidity of the act of the Probate Court was the ground on which rested the jurisdiction of the District Court over the subject-matter. This was spe-cially set forth in the pleadings, and the judgment, contravening, as it did, in every essential particular, the decree of the Probate Court, must necessarily, and as an essential ingredient of the jurisdiction which it exercised, vacate and render void the decree of the County Court.
That the decree of the District Court was final, will be manifest from the descriptions and definitions of such judgments as given in the authorities. In Harrison’s Chancery Practice, p. 622, a decree is declared to be final when all *98 the circumstances and facts necessary to a complete explanation of the-matters in litigation arc brought before the court, and so fully and clearly-ascertained by the pleadings on both sides that the court is enabled to collect the respective merits of the parties litigant, aiid upon a full consideration of' the case, made out and relied upon by each, determines between them according to equity and good conscience.
In the case of Merle v. Andrews, decided at the December Term, 1S49, the-rules for determining the character of a decree, were fully examined; and it was held that a decree was Anal which settles the rights of parties to it, though some independent branch of the case may be reserved for future adjudication. (Story Eq. Pl., sec. 408; 12 Johns. R., 500; 2 Ala. R., 175; 1 Mon. R., 137; 13 Pet. R., 6.) In Forgay et al. v. Conrad (6 How. U. S. R., 207) it was held' that a decree setting aside certain deeds and directing certain lands and slaves to be delivered up to the complainant — that one of the defendants should pay a sum of money to the complainant, and that he should have execution for these several matters, and that the master should take an account of the profits-of the lands and slaves, and also an account of certain moneys and notes, and retaining the bill as to the matters referred to the master, and dismissing it as-to the matters adjudged, and ordering the defendants to pay the costs, — was a final decree, and as such an appeal w'-mld lie from it to the court. In the subsequent cases of Perkins v. Fourniquet et al. (6 How. U. S. R., 207) and Pul-liam and others v. Christian, (Id., 209.) it was held that the decrees were interlocutory, and not the subject of appeal. In the case of Perkins, appellant, v. Fourniqnet et al. the court had decreed that the two complainants were entitled to a certain portion of the property, and referred the matter to a master-in chancery to take and report an accouut of it, and prescribed fully and with proper precision the principles and manner in which the lands were to be divided, and the accounts taken and concluded by reserving all other matters in-controversy between the parties until the coming in of the master’s-reports. This was held to be interlocutory, and not a final decree in any respect ; and it was stated that interlocutory orders and decrees remain under the control of the court and subject to its revision until the master’s report comes-in and is finally acted upon by the court.
This and the other decisions were made in reference to what constitutes such a final decree as would, under the acts of Congress, authorize its revision by appeal. As a matter of convenience, where no appeal is allowed from interlocutory orders or judgments, all the matters in dispute should be disposed ,of below before an appeal is taken, in order that, by a single decision, the 'whole controversy may be terminated. But, with great deference to the tribunal in which these decisions were made, it seems to me that it might admit of doubt, at least upon principle, if not upon authority, whether, at a subsequent term, the Circuit Court could reverse and vacate its decree of a former term in so far as it adjudged the respective rights of the parties to specific shares of the property. And whatever may be the character of such decrees, when considered with reference to the question solely of their susceptibility of appeal, yet, if they be not further ¡u-u-d upon and no appeal is taken, they must be considered, for the purpose of putting an end to litigation, as sufficient to secure the parties in their rights as adjudicated, and would in this aspect be final and conclusive ; and this is especially the case in our practice, in whiclii equity causes maybe submitted to a jury, and judgments such as the one under-discussion may be entered on their finding.
In tlie decree under consideration the respective shares of the parties in the laud were decreed, the costs were ordered to be paid, and commissioners were appointed to divide the land in conformity with the decree. Although, as a matter of convenience, it might be expedient to hold that appeals from such-decrees should not be permitted until action is had upon the report of the commissioners, yet the merits of the case are certainly determined by the decree and the rights of the parties concluded; nor should such decrees be *99 controlled or revised, unless upon appeal or writ of error. The only question which could properly arise on the report of the commissioners would be as to the conformity of the division with the rules settled by the decree, and such as would arise upon the acts of the commissioners.
I will not consume time in discussing whether the proceeding in this case be a hill of review, or one in the nature of a bill of review, or an original bill to impeach the decree on the ground of fraud. Let the proceeding he denominated what it may, yet, if the decree which is the subject of attack be binding on the parties, it bars the action; if otherwise, the demurrer was properly overruled, and the judgment should be sustained.
Is this decree binding on the parties? and, first, does it conclude 'William A. Hemphill and wife? That Hemphill individually (if he be considered a parly in interest at all) is concluded, does not admit of question. He alleges no fact which could, in any degree, impair the force of the judgment as against himself. He states that he intermarried during the progress of the suit, and that, without knowing the legal rights of the parties, and being assured by those in whom he reposed confidence that Maria and Margaret, the children of the widow of the said Mozea Kosseau, had equal claims to a distributive share of the estate of the said Mozea with his own wife and James and Levin ia Eosseau, &e., he consented to the decree, &c., without knowing that he was compromitting the rights of his wife and the said James and Lavinia, and that in so assenting he was imposed upon by the representations of Smith; and, by common report, that the said Maria and Margaret “were the children and issue of the said Mozea Eosseau, dead, by his second wife, Mary P. Eosseau, afterwards Mary P. Smith, and consequently equally entitled to a distributive share of said estate.”
The assertion that he did not know the legal rights of the parties at the time of his intermarriage cannot operate against the effect of the decree; and the allegation, which in substance amounts to the statement that from reposing confidence in others he had mistaken the rights of His wife and her coplain-tiffs, is not sufficient to set aside, especially after the lapse of more that two years, a solemn judgment of the court, entered at his own suggestion, in the premises. Such a reversal would strike at the root of settlements of claims based on judicial decision, and trench deeply upon the supposed stability of rights resting on such foundation.
The theory that relief will he afforded against mistakes of the law is very seductive, ami may, perhaps, be worthy of the sanction of the high authorities by which it has been sustained. There is a seeming difficulty, however, in discriminating between a mistake of the law and ignorance of the law. If the suitor come under the latter category, he is immediately met and overwhelmed by the maxim that ignorantia juris neminem excusat.
The presumptions pretender, who supposes that he has some legal knowledge, hut is mistaken, is relieved; but the man of inert, passive ignorance, (and who can know the laws to be found only by ransacking hundreds of thousands of volumes,) is held to a rigid compliance with his obligations.
I do not intend to repudiate the doctrine that a mistake of law is a good foundation for relief. It is subject, if unrestricted, to this inconvenience, that the adjustment of rights might be indefinitely postponed, if this could not be terminated until the parties could thoroughly explore the mysteries and penetrate into the deep and dark recesses of the law, in order to ascertain whether their primary impressions were based or not on legal principles.
Fortunately, the statute of limitations circumscribes these occult studies as to matters in pais, and litigation is reduced within the compass of human life. If a party in a judicial proceeding has mistaken the law, and the error be not waived by consent, it may be remedied by appeal, writ of error, or bill of review; and if redress be not sought through these processes, and in *100 the time prescribed, he is forever concluded. For the principle in relation to relief from mistakes of law, vide 4 Strobh. Eq. R., 198 ; 2 Bail. B., 623 ; 1 Hill Chan. R., 242; 2 Pothier, 320.
The plaintiff’s statement, that he was imposed upon by the representations of Smith as to the legitimacy of Maria and Margaret, can avail nothing. It does not even appear that Smith represented they were lawfully begotten, but only that they were the children of the deceased Rosseau and .his second wife. This is true. They were the children of these parents;-and had the averment been that Smith had represented them to be legitimate offspring, yet this would be no such fraudulent representation as would impeach the decree. Tlie truth in relation to their legitimacy could have been ascertained with the slightest effort. Had Smith and common rumor suppressed the truth, his own wife, for whom he was acting, could have given him full, precise, and accurate information. Tlie decree is not, therefore, subject to impeachment by this party, either on tlie ground of mistake or fraud.
Tlie next point for consideration is, whether his acts are binding on his wife. In the. solution of this inquiry very little aid can bo derived from an examination of tlie doctrines pervading the English jurisprudence in relation to the capacities of the wife to sue or be sued during the marriage, and tlie effect of the husband’s acts upon her rights.
By the common law, during coverture, the separate legal existence of tlie wife is extinguished; and, as a consequence, suits in relation to her rights must be in the joint names of husband and wife; and he may sue alone for all such property of tlie wife as he can dispose of for his own use.
If a recovery of the wife’s property can be prosecuted only in equity, although when recovered it may vest in the husband, yet the wife must be joined, in order that a provision may be made for her, or that she may elect that the property shall go to the husband.
Where the suit is in relation to the separate estate of the wife, the suit must be brought by the wife alone, in the name of her next friend.
If she be joined with her husband, or the suit be brought in his name as next friend, the suit will be regarded as that of the husband alone, and will not prejudice tlie separate interest of the wife, nor bar a subsequent suit by her and her next friend; and, as a consequence of this right of the wife, the defendant may demur unless the suit be brought in the name of the wife by her prochain ami. (Dan. Chan. Pr., art. MARRIED Women; 2 Bright, Hus. and Wife, 263.)
Tliese distinctions, and tlie grounds on which they proceed, are unknown to our system of jurisprudence. The rig-lit of the wife in her own property cannot be affected, under our laws, by tlie circumstance of the joinder of the husband in a suit for its recovery. Let it be recovered bjr whom and how it may, it remains unchanged, tlie absolute property of the wife. By the ninth section of tlie act of 1840 adopting the common law, &c., (art. 2415,) it is declared that tlie husband may sue, either alone or jointly with his wife, for the recovery of any effects of the wife. This vests him with authority to prosecute the suit in his own name, or by joinder with the wife, at his option.
The law constitutes him the agent or attorney of his wife in this particular; and his acts in this capacity,- done in good faith, must be binding and conclusive upon liis principal.
She would be entitled to no redress for errors in the proceedings of which he could not avail himself.
If tlie husband were incompetent, or was endangering the rights of his wife by negligence, the court would doubtless, on proper representation, interfere for her protection; or, if he were guilty of fraud or collusion, she might impeach tlie decree vitiated by such fraud. But the husband should then be made defendant, and not a coplaintiff with his wife. If, therefore, in contradiction to the record, it could, be shown that the husband alone assented to this decree, yet it would be conclusive upon the wife. But, as we have previously stated, the record shows that the decree was assented to by all the parties.
*101 This cannot he impeached by extrinsic testimony. It was immaterial by whom tile agreement may have been drawn or signed. When made the judgment of the court, it concluded the rights of the parties therein adjudged..
The next point is as to the effect of the judgment upon the rights of the minors, James and Lavinia Bosseau. The suit was commenced by Mrs. Welch-meyer in her own name, the minor brother and sister joining as coplaintiffs, and suing by their next friend, David Holderman. Was Holderman authorized in law to institute suit in such capacity?
It seems that aprochein ami for an infant was not known before the statutes of Westminster, passed in the reign of Edward the First; and though this statute was not introduced by the adoption of the common law, yet upon the introduction of that system, the rule, under the statute, seems immediately to have been carried out in practice; and this has continued for such period of time, and been sanctioned by such general usage, that it would seriously endanger the multiplied rights growing up and settled under such rule were it now declared to be unauthorized by law.
The case before the court furnishes evidence that the rule is deeply rooted in practice. One of the plaintiffs, who is an infant, sues by her next friend; and the infant heir of an adult plaintiff, who died during the pendency of the suit, continues its prosecution by the agency of a next friend; and this in a suit for the repudiation of the acts of a next friend, on grounds which involve his want of authority. There are cogent .reasons why infants should have the power of suing by their next friend; otherwise, there might be no redress against injuries inflicted by guardians on their nearest relations. This authority seems necessary for their protection; but, as a general rule, and as incident to this right of suit, they are as much bound as if they were adults or of full age. (Dan. Chan. Pr., 92; 2 Madd. Chan., 461.) It is true, that if the next friend does not lay his case properly before the court, by collusion, neglect, or mistake, a new bill may be brought on behalf of the infant. (Story’s Eq. PI., sec. 59; Mitford, 26, 27.) But no such charge against the next friend is substantiated by the facts or circumstances in this case. 1-Ie sued in conjunction with a plaintiff who was of full age, who was equally interested with the minors, and who was active in its prosecution. The most eminent of the profession were engaged to sustain their claims; and the decree which was finally entered had the sanction of their joint counsel and of the adult coplaintiff.
Can any imputation rest on the next friend, that, under such circumstances, he assented to the decree? That he did not prosecute further the rights of the infants? That he did not engage in what must have seemed a hopeless enterprise ?
There are some cases in relation to the partition of real estate in which a day has been given to an infant plaintiff to show cause, after he came of age, against the decree. (2 Madd. Chan., 461; Dan. Chan. Pr., 93; 2 P. Wm. R., 519; 2 Ves. R., 23.) In relation to personal estate, it is said, such a rule would be most mischievous.
I am not able to perceive any distinction between real and personal property in this particular. If mischief arises from the infant’s power to dispute anything done in relation to his education, maintenance, &c., it would equally grow out of his power to relitigate the rights of parties owning lands in common with themselves, and to eject them from their possessions, after years of enjoyment under a regular judicial proceeding.
But the cases, so far as they have been accessible, relate to suits for the partition of lands. But. this was an action for the recovery of the entire tract; and though this was subsequently distributed between the parties, yet this was the act of the court, and was not within the contemplation of the plaintiffs at the commencement of proceeding. To have perfected the rights of the parties, it was not necessary, under our practice, that the parties should have mutually and respectively conveyed their rights in the shares of each other. The decree of the. court, and the division in conformity therewith, would have been the *102 only muniment of title necessary; aud therefore there is no reason, in our practice, for the delay until an infant attain the age at which by law he can execute a conveyance.
We are of opinion, therefore, that the minors were concluded by the acts of theirprochein ami, aud by the decree made in adjustment of their rights.
The judgment being conclusive of the rights of all the parties in this suit, the first ground assigned is well taken, and there was error in overruling the demurrer.
Let us inquire whether, at the time and under the circumstances of its rendition, the decree was not as favorable to the infant plaintiffs as could have been, (if not desired,) at least, anticipated. It appears from the testimony that the league of land in controversy was granted to Rosseau twelve or eighteen months after the death of his first wife,'and at the time of his cohabiting with and treating as a wife the mother of the defendants, Maria and Margaret. The evidence tends to show that, by general repute, they were at that time regarded as man and wife. The agent of the empresario certifies, at the date of the grant, that he is a married man. This could not be referred to the matrimonial union with his first wife, who had then been dead twelve or eighteen months.
The marriage of Rosseau to the mother of Maria and Margaret, subsequent to their birth, was generally believed to have impressed them with the character aud rights of legitimacy. This' impression continued for years, and, doubtless, had a potential influence in the adjustment of their rights by the decree of 1843. But other circumstances than that of the injustice which would have been inflicted on the children, Maria and Margaret, by depriving them of all share in the land, may have suggested themselves as inducements to the compromise then effected.
Rosseau died in 1S32, in about twelve months after receiving title to the laud. This title was incumbered with several conditions — one of which was, that the land could not be alienated until entirely cultivated. This lias been considered as completed within six years from the date of the grant. Another was, that, if the new settler left the State, and had not previously disposed of his land, which he could not do until the cultivation was completed, the. land became and remained entirely vacant. These were some of the disabilities imposed upon the new settler; and if he died before cultivation of the laud, his heirs, by article 28 of the Colonization Law of 1825, succeeded to his rights in the land, but under the obligations and conditions imposed on the grantee. They were bound, then, to cultivate the land in the time prescribed by law. Were they not compelled also to remain in the country, to secure their title to the land according to the conditions of the grant?' This was one of the conditions imposed upon their ancestor, and they received the title under all its conditions. No distinction was made in the Jaw between heirs above and under age. No exception was made in favor of minors. They were not, in express terms, exempted from the operation of the law nor from its destructive force if its provisions wore contravened. Now, what were the circumstances under which the minors presented their claims to this land, in 1843 ? They were not in the country, and had not been for ten years, nor docs the record show that they had then any intention of returning. They left immediately after the death of their father and before the land had been cultivated, in the contemplation of law.
We have seen that, by plausible construction at least, such abandonment by all the heirs would have vacated the whole title; and can a party who incurs by his acts the penalty of forfeiture shield himself under the merits of others, aud their performance exclusively of an obligation alike imposed upon all interested ? If abandonment by all the heirs superinduces a forfeiture, should not an abandonment by one defeat his interest in the property? I do not intend to express a positive opinion that an abandonment by a minor of the country, under the circumstances presented in this case, would extinguish *103 fliis right to a portion of land granted under the colonization law and not ■cultivated.
I only say that, possibly, an apprehension of such consequences may or might have induced the assent to the decree of 1843. It might have been supposed that there was room for doubt in relation to the validity of their • claims in law; that this cloud upon their title originated in their own acts, and under such circumstances the guardian was justified in his assent to the decree; nor is it one of which, with any show of justice, they can complain.
Being of opinion that the decree of 1843 was conclusive upon the rights of ■the parties, the court erred in overruling the demurrer, and in its judgmentfor the plaintiff. It is therefore ordered, adjudged, and decreed that the judgment •of the District Court be reversed and the cause dismissed.
Notion to Reform the Judgment.
Hemphill. Ch. J.
The appellants have suggested that, by their answer, they prayed, in substance, that the decree of the District Court of 1843 be carried into execution; and they move that the judgment be reformed, and an •order to that effect be made.
To this the appellees have assented, and, in fact, it is a right to which the .appellants are entitled. Under our system of procedure, ail matters touching the cause of action which might, under our former jurisprudence, have been pleaded in reconvention, or which may, in chancery practice, be set up in a •cross-bill, maybe alleged in the answer, by way of defense and for redress. (Egery v. Power, 5 Tex. R.; Walcott v. Hendrick, 6 Tex. R.; Bradford v. Hamilton, decided at Austin, 1S51.) The appellants might have brought an ■original petition for the purpose of enforcing this decree, and, in defense to an •attack upon it, they may allege, not only such matters as show its invulnerability, but may also pray for such relief as to make t.he remedy intended by the ■decree effective, and which will forever conclude all rights touching the matters 'Controverted between the parties.
This prayer in the answer was not noticed in the opinion nor eonsid-•ered in the judgment, for the reason that the attention of the court had not been directed to it by the argument of counsel.
The judgment will, in conformity with the motion, be reformed; but as it •must be opened for that purpose, an amendment in another particular is deemed advisable. Among other matters decreed in the judgment of the District Court at the Fall Term, 1S49, it was adjudged that all the orders and .judgments of the Probate Court of Bastrop county, at the June and August Terms, 1S38. and at the December Term, 1842; respecting the division of the ■estate of Mozea Rosseau, deceased, so far as tiie same concerned (he league of land mentioned in the plaintiff’s petition, and all the proceedings had under .said orders and judgments, in the partitioning of said land, as referred to in plaintiff’s petition, should be, and the same were thereby, annulled and vacated, and made void and of no effect.
Although it has been shown that the said orders and decrees, at least those of 1838, were virtually annulled by the said decree of the District Court, at its 'Spring 'Term, 1843, yet their abrogation in express terms by that decree would have been more in conformity with correct practice, and if it had not fortified, would at least have simplified and disembarrassed, the muniments of the titles -of the parties to their several shares of the laud in question. Under this view, that portion of the decree of the District Court which vacates and annuls the ■decree of the Probate Court will be affirmed.
As the decree will be partly reversed and partly affirmed, a question arises as to the distribution of costs between the parties.
In practice, heretofore, the costs have been adjudged wholly against one of the panics, and in favor of the other.
This at least has been the general rule; and such, at first view, is the regulation embodied in tbe 122d section of the act. to regulate proceedings in District Courts. (Dig., art. 776.) This section reads as follows: *104 “In all cases of law, except motions, where judgment shall be given for-defendant or appellee, he shall recover his costs against the plaintiff or appellant, and liave execution for the same; and in all such cases where judgment shall be given for the plaintiff or appellant, if not otherwise provided bylaw, he shall recover his costs against the defendant or appellee, and have execution for the same.”
On examining- this section, several considerations are suggested as to the-propriety of assessing, in all cases, against one of the parties the whole costs..
■ The phraseology is remarkable. The terms, in their literal import, do not embrace all cases or all suits, but only cases of law.
The Legislature may have intended the provision to extend to all cases or-suits. Under that construction, the additional phrase, “of law,” is unnecessary and superfluous. But the design may have been to leave it discretionary with the courts to tax and distribute the costs in cases, which, under a separate or exclusive chancery jurisdiction, would have been cognizable in equity. Sucli intendment is not, under onr code of procedure, to be indulged, unless-the will of the Legislature to that effect is clearly expressed. We have not the diversity' of forums on which the distinctions in rules of practice are-founded ; and, if possible, such rules should extend alike to all cases or suits.
But, whatever may be the construction of that portion of the section to-which we have referred, the section, as a whole, extends only to cases in which the entire judgment is given for the plaintiff or the defendant. It does not. include cases in which judgment, as to a portion of the matters in controversy, is given for one of the parties, and against him as to other matters.
Another consideration presents itself, as to the jurisdiction in which the rulé-is intended to operate. Is it imperative on the Supreme Court? By the section, defendants or appellees are placed in the same category, and so are the plaintiffs or appellants; and it may liave been intended to embrace,, under the one, the parties in the defensive, whether in the District or the-Supreme Court, and under the other, the parties in the prosecution.
If such wore the design, tlie question is, whether the provision, in so far as-it purports to regulate the proceedings in the Supreme Court, is not nugatory',, as being in contravention of the Constitution. The provision is a portion of a. statute entitled, “An act to regulate the proceedings in the District Courts;” and, under the Constitution, the law is restricted to the object as expressed! in the title.
The 34th section of article 7 of the Constitution declares, that “every law enacted by the Legislature shall have but one object, and that shall he expressed in the title.” The object of this act is single, and is expressed in theta !e; and its provisions cannot be construed to regulate proceedings in any other Ilian the District Courts.
Such is the inevitable result of the constitutional provision, and such its force- and effect, if it bo mandatory, and not directory, in its character. The consequences of such a restriction on legislative discretion and power, of the application of such a test of the validity of special provisions, years, nay ages, after their passage, and after rights under them liave accrued, mayr be very inconvenient anil destructive. But such results were for the consideration of the convention; and, in their wisdom, such restriction was deemed salutary and' proper.
It would he irrational to suppose that this provision of the Constitution is-merely a directory one, which may be obeyed or disregarded at the will and. caprice of the Legislature. Under such construction, it would be shorn of its-strength and efficacy — would become a dead letter — a mere excrescence in the Constitution.
It is to he regretted that a question involving the constitutionality of a law was not discussed before decision.
We would, most willingly-, have availed ourselves of all the lights which-, might have been shed on the subject. But the question was presented,, and its determination could not be postponed for the benefit of discussion.
Note 22. — Recitals in judgments are binding on the parties. (Hutchinson v. Owen, 20 T.,‘287;. Laird v. Thomas, 22 T., 276; DeWalfe v. Snow, 25 T., 320; Goss v. Pilgrim, 23 T., 263; Chester v. Walter* 30 X 53 )
Note 23. — Patrick v. Gibbs, 17 T., 275; Harmon v. Bynum, 40 T., 324.
Note 24. — Hatchett v. Conner, 30 T., 104.
Note 25. — Robson v, Osborn, 13 T., 298.
Note 26. — Hammonds v. Belcher, 10 T., 271; Castro v. Gentiley, 11 T., 28; Carlin v. Hudson, 12 T., 202; Peiser v. Cushman 13 T., 390; Sterrett v. Houston, 14 T., 153; Castro v. Whitlock, 15 T., 437; Brady v. Price, 19 T,, 285; Carothers v. Thorp, 2t T., 358; Punchard u. Taylor, 23 T., 424; Duncan v. Magette, 25 T., 245; Hamilton v. Van Hook, 27 T., 302; Culbertson v. Cabeen,29 T., 247; Brown v. Tyler, 34 T., 168; Coleman v. Bunce, 37 T., 171; Osborn v. Schiffer, 37 T., 434; Beckham v. Hunter, 37 T., 551; Munnerlyn v. Alexander, 38 T., 125.
Notb 27. — City of San Antonio v. Gould, 34 T., 49; The State v. McCracken, 42 T., 383; Gaston ü. McKnight, 43 T., 619.
The judgment heretofore rendered is ordered to be set aside; and, proceeding- to eider judgment, it is ordered, adjudged, and decreed that the decree of the District Court he in all things reversed and set aside, except in so far as it annuls and vacates the various decrees and orders of the Probate Court relative to the division of the said league oE land and the proceeding's under such decrees, and that all that portion of the decree he affirmed; and it is further ordered, adjudged, and decreed that this cause he remanded to the District Court, with instructions that, the said court shall cause, on the application of the parties, all such orders to be made and such proceedings had as may he necessary to carry the decree of the District Court, rendered at the Spring Term, 1843, into effectual execution; and it is further decreed that the appel-lees do pay all the costs expended in the District Court; and that the costs in this court be equally divided between the parties, appellants and appellees;, and that the costs of the further proceedings abide the order of the District Court.
Reversed and reformed.